Denver O'DELL, Appellant,

v.

Bill ARMONTROUT, Appellee.

No. 88–1726.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 16, 1988.

Decided June 28, 1989.

Rehearing and Rehearing En Banc
Denied Sept. 13, 1989.

William P. Grant, St. Louis, Mo., for appellant.

Jared Richard Cone, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and BRIGHT, Senior Circuit Judge.

---

JOHN R. GIBSON, Circuit Judge.

Denver O'Dell appeals from the district court's [1] denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254, in which he attacks his second-degree felony murder conviction for the shooting death of his wife, Ruth O'Dell. Although Ruth was shot by another man, Calvin Eugene Pyatt, the incident took place during O'Dell's attempted second-degree assault on Pyatt. O'Dell argues that the state presented insufficient evidence to support his conviction because there was no proof that he had taken a substantial step towards assaulting Pyatt. O'Dell also claims that improper juror communications denied him the fair trial required by due process. He also argues that the jury rendered inconsistent verdicts, in that while he was acquitted of second-degree murder and manslaughter charges concerning the death of Pyatt, the jury returned a guilty verdict on the felony murder charge. Finally, he argues that the state impermissibly based his conviction upon an underlying offense that was a misdemeanor, not a felony.[2] We affirm the judgment of the district court.

Thirteen days before the shooting incident, a deputy sheriff found O'Dell lying on a rural highway, suffering from severe injuries that required his hospitalization for ten days. O'Dell said that he had been assaulted by Calvin Eugene Pyatt and some other men. The deputy asked if O'Dell wished to sign a complaint against the men, to which O'Dell replied, "Hell no, I won't sign nothing, I will take care of the matter myself." O'Dell was released from the hospital just three days before the encounter with Pyatt.

On the morning of the shooting O'Dell and his wife visited a local tavern. O'Dell informed the proprietor that Pyatt had injured him, and stated "I am going to get my evens." His wife added, "When Den-

---

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri, adopting the reports and recommendations of the Honorable Carol E. Jackson, United States Magistrate for the Eastern District of Missouri.

2. O'Dell raises one argument not argued before the Missouri courts: that the jury was misin-structed in that a manslaughter instruction should have been given for both counts. Since the claim was not raised before either the trial court or the Missouri Court of Appeals, O'Dell is procedurally barred from raising it here. *See Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977).

ver gets done with his licks, I am going to put mine in." Meanwhile, Gene and Wayne Schmidt, two friends of O'Dell, returned from Texas. After being informed of the events of the previous two weeks, Gene Schmidt encountered Ned Pyatt, Calvin Pyatt's brother, and advised him to "Tell that brother of yours he shouldn't have whipped up on Denver O'Dell." Later, the Schmidts and O'Dells bought some beer, and borrowed a shotgun, purportedly so that they could hunt turkeys.

The group did not go turkey hunting, however, but instead began to drive by Pyatt's home, supposedly because Ruth O'Dell wished to know where to find poke greens to make a salad. The Schmidts sat in the front seat, with a loaded 20–gauge shotgun between them, and O'Dell and his wife sat in the back seat, with a loaded 12–gauge shotgun on the floor in front of them. The group was additionally armed with a table leg and a nightstick. Pyatt's house was passed twice without incident, but the third time the group drove by they spotted Pyatt. It is unclear whether Pyatt waved for them to stop or not, but in any event they did stop and Pyatt walked up to the car. Pyatt leaned in and said to O'Dell, "I thought I killed you." O'Dell answered "Not yet," to which Pyatt replied "I will cure that right now." Pyatt retrieved a .30 carbine from his car and fired two shots. O'Dell was hit in the chin and below his left arm, and his wife Ruth was fatally struck in the back. The Schmidts returned fire with two shotgun blasts, killing Pyatt. These events are developed in far greater detail by the Missouri Court of Appeals in affirming O'Dell's conviction, *State v. O'Dell*, 684 S.W.2d 453 (Mo.Ct.App.1984), *cert. denied*, — U.S. —, 109 S.Ct. 319, 102 L.Ed.2d 337 (1988), but for our purposes this account will suffice.

O'Dell was subsequently charged with second-degree murder, in that he acted in concert with the others in killing Pyatt. He was acquitted of this charge. He was also accused, however, of committing second-degree felony murder in the death of his wife, on the allegation that she died as a result of his attempt to commit a felony, namely the assault on Pyatt. The jury returned a guilty verdict on this count, and O'Dell was sentenced to fifty years imprisonment. He appealed and filed for appropriate postconviction relief, all of which was denied, exhausting his state remedies. He then brought this petition for a writ of habeas corpus, raising essentially the same issues argued before the Missouri courts. The case was referred to a magistrate who, after conducting hearings and compiling reports, recommended that the writ not issue. The district court adopted these findings and denied the writ.

## I.

O'Dell argues that the State of Missouri produced insufficient evidence to support his conviction. Due process requires that the prosecution prove every fact necessary for conviction beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed. 2d 368 (1970). For federal courts reviewing state court convictions under this standard,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted, emphasis in original).

O'Dell claims that the state failed to prove that he was attempting to commit a second-degree assault on Pyatt during the encounter. More specifically, he argues that there was no evidence of a conscious plan to assault Pyatt or of any overt act to inflict unjustifiable physical injury on Pyatt by means of a deadly weapon. Having studied the record, we conclude that a reasonable jury could have determined that O'Dell and his group formed a plan to assault Pyatt with deadly weapons, and

that the group had taken a substantial step toward completing their plan.[3] First, there was ample evidence to support the intent of O'Dell to assault Pyatt. Pyatt had previously severely beaten O'Dell, yet O'Dell refused to sign a complaint, preferring to handle the matter himself. He stated his intent to get even to several witnesses, and his accomplices, the Schmidts, made similar statements to Pyatt's brother. Second, the evidence indicates that the O'Dell group made numerous trips past the Pyatt home while in possession of dangerous weapons, including two clubs and the two shotguns eventually used to kill Pyatt. Finally, when the group did confront Pyatt a belligerent argument ensued, which ended only with gunfire and the death of two participants.

The Missouri Court of Appeals painstakingly set out this evidence and the conclusions that might be drawn from it:

> The jury could further find that when [the O'Dell group] first found Eugene Pyatt was not home, they looked for him at Ned Pyatt's. When they drove by the second time they honked to lure him from the house. They drove by on their third trip, before returning, to be sure he was alone. They then returned to carry out their purpose.
>
> O'Dell had a motive to commit the offense. He provided the automobile. O'Dell's presence in the automobile, his companionship with the Schmidts and his conduct before the offense was a sufficient basis for the jury to find he was an "aider."
>
> When the O'Dell automobile returned on the third trip, the foursome had searched for Pyatt; by honking they enticed Pyatt from his house and they had reconnoitered the place contemplated for the commission of the offense. This was abundant evidence upon the basis of which the jury could further find that at the time of, and as a direct result of, this substantial step in the commission of as-

sault in the second degree, Eugene Pyatt fired and killed Ruth O'Dell. By their verdict, the jury found these things to be true. That determination is supported by the evidence.

*State v. O'Dell*, 684 S.W.2d 453, 463 (Mo. Ct.App.1984). We agree with the Missouri Court of Appeals that this evidence, viewed in a light most favorable to the state, satisfies the *Jackson* standard of review for the conclusion that O'Dell took a substantial step toward committing a second-degree assault on Pyatt. The comments following the Missouri attempt statute list a number of facts that may be held to constitute a substantial step, including searching for the intended victim, reconnoitering the area where the offense is planned, possessing materials to aid in the commission of the offense that have no immediate legitimate uses, and soliciting agents to help in committing the offense. *See* Mo.Ann.Stat. § 564.011 (Vernon 1979) (comment to 1973 proposed code). As we have discussed, evidence supported the finding that all of these factors were present in this case.

There was testimony that the O'Dells and Schmidts drove by Pyatt's house three times, leading to the inference that they were searching for him and reconnoitering the area. The evidence also showed that they were armed with guns and clubs, items having no legitimate uses at that time. The group used O'Dell's car. Additionally, the shotgun that had been next to O'Dell in the back seat of the car was found with the hammer pulled back in a firing position and with a shell in the barrel. Finally, following the shooting the group quickly left the crime scene. These pieces of evidence are all indicia of O'Dell's participation in the crime, *see, e.g., State v. Kennedy*, 596 S.W.2d 766, 769 (Mo.Ct.App. 1980) (listing factors that may be used to show involvement in criminal scheme or act), and are sufficient to establish O'Dell's culpability for the charged offense.

---

**3.** Under Missouri law,

> A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the

offense. A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

Mo.Rev.Stat. § 564.011 (1986).

O'Dell's reliance on the recent case of *State v. Molasky,* 765 S.W.2d 597 (Mo.1989) (en banc), is misplaced. The court in that case reversed a conviction for attempted murder, but did so only because the attempt consisted solely of conversation, unaccompanied by positive acts. *Id.* at 602. Thus, the court simply stated that "a substantial step is evidenced by actions, indicative of purpose, not by mere conversation standing alone." *Id.* The present case, by contrast, presents evidence of an array of affirmative acts taken to carry out the plan. *Molasky* therefore does nothing to dispel our conclusion that the jury was justified in finding that a substantial step had been taken towards carrying out the assault.

## II.

■ O'Dell next argues that improper and prejudicial communications with jurors, and other juror bias, deprived him of his due process right to a fair trial. Specifically, he alleges prejudice in that Inez Vaughn, the mother of Ruth O'Dell, Connie Pogue, the daughter of Ruth O'Dell, Bradshaw Smith, the prosecutor, and his wife, Wanda, all spoke with jurors during the course of the trial. He also claims that the foreman of the jury previously knew and dated Ruth O'Dell, and that another juror frequented a bar where she was formerly employed. O'Dell argues that under *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), prejudice must be presumed from these events, and that the state did not come forward with evidence to demonstrate that prejudice did not occur.

The first instance of improper communication occurred when Vaughn spoke to juror Kathryn Pogue. O'Dell brought this to the trial court's attention at the close of evidence, and moved for a mistrial. The court questioned the women briefly in chambers and discovered that they had indeed conducted a brief conversation, but determined that they had not discussed the trial. O'Dell's counsel declined the invitation of both the court and the prosecution to present evidence, and the motion was

denied. That decision was later affirmed by the Missouri Court of Appeals. *See O'Dell,* 684 S.W.2d at 469. The findings of the Missouri courts, presumed correct and entitled to deference absent convincing evidence to the contrary, *see Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam), are supported by the record. We therefore agree with the Missouri courts, the magistrate, and the district judge that O'Dell failed to prove either that the conversation concerned the trial or that he was actually prejudiced. *Remmer* dealt with communications concerning the trial itself, and here O'Dell does not establish this threshold condition. *Remmer* is therefore inapplicable. The burden was on O'Dell to prove actual prejudice, and he failed in this respect.

After the jury had retired for deliberations, O'Dell told the trial court that members of Ruth's family had been observed making inflammatory remarks to jurors, that the prosecutor's wife had spoken with the jury and served them food, and that the prosecutor, the sheriff, and the wife of the deceased Pyatt had all spoken with the jury. O'Dell produced no evidence to support these allegations, and the trial court deferred ruling until after the jury returned its verdict. When the motions were renewed O'Dell again failed to produce any evidence in support. The motions were denied without a hearing. When the magistrate conducted an evidentiary hearing, several of O'Dell's witnesses testified that they heard inflammatory remarks made in the presence of jurors. All of the jurors denied discussing the case with outsiders, however, and each denied hearing any statements concerning O'Dell or the victims outside of the trial proceedings. One juror, Pogue, testified that Vaughn had talked about her grandson, who was serving in the Armed Forces. Another juror, Violet Banthrall, testified that she heard a conversation between a woman and a female juror concerning a trip to Las Vegas, but that the conversation stopped at the command of the court clerk. No other juror reported any outside communications of any kind.

Again, O'Dell failed to meet his burden of proof. He produced no evidence before the trial court, prompting the Missouri Court of Appeals to characterize the claims as "no more than a verified report of hearsay." *O'Dell*, 684 S.W.2d at 470. Moreover, the evidence he produced for the magistrate's hearing was mixed at best. The most O'Dell could establish was that conversations had taken place: none of his witnesses could identify the contents of those communications. The state produced evidence that some words were exchanged, but only on non-trial subjects, and only until the participants were advised that their conduct was improper. The magistrate found that O'Dell had failed to establish the existence of any prejudicial communications during his trial. The findings of fact of the magistrate's order that support this conclusion are not clearly erroneous and no error of law has been established.

Finally, O'Dell claims juror bias in that the jury foreman, George Barton, once dated Ruth, and another juror, Victor Hayes, knew her through Ruth's employment at a local bar. We find no cause for reversal. During voir dire, all of the jurors except Pogue denied knowing Ruth or any of her relatives. At the magistrate's evidentiary hearing Barton vigorously denied that he knew Ruth. Although Barbara Schmidt testified that Hayes frequented the tavern where Ruth once worked, Hayes denied ever meeting a barmaid named Ruth O'Dell. The magistrate found that neither Barton nor Hayes knew Ruth O'Dell, and these findings are not clearly erroneous. The findings fully answer the arguments urged by O'Dell with respect to these two jurors.

### III.

■ O'Dell further claims that the jury returned inconsistent verdicts in finding him innocent on the charge of murdering Pyatt, but guilty in the felony murder of his wife. He claims that the first finding precludes the second, since they contain many similar elements. Collateral estoppel does not, however, apply to verdicts and findings made by the same jury; it is used only in subsequent litigation. Further, even if such an application were appropriate, the verdicts in this case were not inconsistent.

■ The first charge against O'Dell was that he acted in concert with the Schmidts with the intent to kill Pyatt. The jury found that he did not do so. The second charge was that he engaged in a joint effort with the Schmidts to injure, but not kill, Pyatt with a dangerous weapon, and that as a result Ruth O'Dell was killed. The jury believed that this was the case. Viewing the record as a whole, this finding was reasonable. O'Dell's purported motive for injuring Pyatt was revenge for an earlier beating, and O'Dell may well have intended to respond simply with a non-lethal assault of his own. Thus viewed, the two verdicts were consistent. In any event, inconsistent verdicts in criminal cases do not require reversal if sufficient evidence exists to support a finding of guilt. *See United States v. Benfield*, 593 F.2d 815, 822 (8th Cir.1979); *State v. Clemons*, 643 S.W.2d 803, 805 (Mo.1983) (en banc). Since we have already decided that the conviction was supported by the evidence, this claim is meritless.

### IV.

■ Finally, O'Dell claims that he could not have been convicted of felony murder because the crime supporting that charge, attempted second-degree assault, is only a misdemeanor. Second-degree assault, however, is a class D felony. *See* Mo.Rev.Stat. § 565.060 (1986). Missouri courts have held that the attempt to commit a felony, although only a misdemeanor in itself, is sufficient to warrant application of the felony murder rule. *See O'Dell*, 684 S.W.2d at 462; *State v. Cross*, 629 S.W.2d 673, 674 (Mo.Ct.App.1982). This court is bound to follow state court interpretations of state law, and we therefore decline O'Dell's invitation to reexamine this point when the Missouri Court of Appeals explicitly ruled on it.

We affirm the judgment of the district court.

**BRIGHT**, Senior Circuit Judge, dissenting.

I dissent. This court should not continue supporting the unjust jury verdict of guilty.

Without extensive rhetoric, let us look at the strange circumstances of this case. When the O'Dell car pulled up to Eugene Pyatt's residence, Pyatt approached the car and expressed the belief that he had killed O'Dell during the beating two weeks earlier. After discovering otherwise, Pyatt retrieved a .30 carbine and fired twice upon the O'Dell vehicle. One shot killed Ruth O'Dell, and the other disabled Denver O'Dell. Only after Pyatt had wounded the O'Dells did Gene Schmidt return fire and kill Pyatt. Although O'Dell never touched his gun, which remained on the floor in the back seat during the entire incident, he was convicted for the second-degree felony murder of his wife who was sitting next to him.

O'Dell's felony-murder conviction can stand only if sufficient evidence establishes an attempt to commit a second-degree assault—that is, that O'Dell took a "substantial step" toward inflicting injury upon Pyatt with a deadly weapon. Mo.Ann.Stat. § 564.011 (Vernon 1979). Mere talk, solicitation or preparation does not constitute a substantial step. *State v. Molasky*, 765 S.W.2d 597, 602 (Mo.1989) (en banc). Rather, the defendant must have taken some affirmative action in furtherance of the crime that corroborates the firmness of his intent to complete the offense. *Id.* at 601. Under the common law of attempts, this act "must be of such an unequivocal nature, in order to be a valid corroboration, that it would seem, at the time the act is committed, that voluntary termination is unlikely." *Fryer v. Nix*, 775 F.2d 979, 993 (8th Cir.1985).

An instructive Missouri case is *State v. Zismer*, 696 S.W.2d 349 (Mo.Ct.App.1985), in which two defendants were convicted for the attempted second-degree assaults of two game wardens. In affirming the convictions, the Missouri Court of Appeals stressed several factors as sufficiently establishing a substantial step. First, the defendants drove toward the wardens in stealth at night, with their lights off. Second, both defendants cursed and threatened to kill the wardens. Further, both defendants brandished guns while making the threats. One man actually aimed his gun at the wardens, while the other repeatedly ignored the wardens' demands that he lay down his weapon. *Id.* at 353.

*Zismer* seems to emphasize that an attempt requires the joinder of the means to commit the crime with a present intent to do so. Both defendants in that case carried weapons at readiness to shoot and expressed the intent to kill.

The present case, however, involves conduct very different from that in *Zismer*. The O'Dells and Schmidts stopped at Pyatt's home in the middle of the afternoon, and only after Pyatt saw them drive by. Moreover, no occupant of the O'Dell car threatened Pyatt or even touched a gun before Pyatt initiated the gunfire. Thus, Pyatt became the sole actor, without objective provocation from O'Dell, in the ensuing killing of Ruth O'Dell. The only substantial step taken in this case was that of Pyatt in grabbing his weapon, aiming it, and shooting it. Under these circumstances, no jury could reasonably conclude that O'Dell attempted to assault Pyatt with a deadly weapon. *See State v. O'Dell*, 684 S.W.2d 453, 472–73 (Mo.Ct.App.1984) (Greene, J., dissenting), *cert. denied*, —— U.S. ——, 109 S.Ct. 319, 102 L.Ed.2d 337 (1988).

The absurdity of the result in this case is illustrated by two hypothetical questions. First, if Pyatt had just walked back into his home rather than retrieving a gun and firing on the O'Dell car, could a reasonable jury have convicted O'Dell for attempted second-degree assault? The negative answer is self-evident. Second, if Pyatt had survived and O'Dell had been killed, would Pyatt have been the defendant in this case? The affirmative answer seems equally obvious. Apparently, the prosecutor believed that someone should pay for the killing of Ruth O'Dell, regardless of who pulled the trigger.

It is a strange doctrine that would make mere words and visitation, without more, an attempt to commit a felony. The final confrontation between O'Dell and Pyatt was completely peaceful on O'Dell's part. Making O'Dell criminally responsible for Pyatt's later violent action defies reason. The Missouri Court of Appeals has twisted the law of attempts into a pretzel to sustain O'Dell's conviction. We should not follow suit. I would grant habeas corpus relief.